WE ARE AMERICA, et al., Plaintiffs,

v.

MARICOPA COUNTY BOARD
OF SUPERVISORS, et al.,
Defendants.

No. CIV 06–2816–PHX–RCB.

United States District Court,
D. Arizona.

Sept. 27, 2013.

Danilo Ballecer, Ballecer & Segal LLP, Antonio D. Bustamante, Law Office of Antonio D. Bustamante PC, H. Michael Clyde, Perkins Coie LLP, Phoenix, AZ, Carlos Holguin, Peter Anthony Schey, Center for Human Rights & Constitutional, Los Angeles, CA, Ray Velarde, Law Office Of Ray Velarde, El Paso, TX, for Plaintiffs.

Timothy James Casey, Schmitt Schneck Smyth Casey & Even PC, Anne Cecile Longo, MCAO Division of County Counsel, Laurence G. Tinsley, Jr., Maricopa County Attorneys Office – Civil Services Division, Sally Wolfgang Wells, Bruce P. White, Maricopa County Attorneys Office, Dennis Ira Wilenchik, Wilenchik & Bartness PC, Phoenix, AZ, for Defendants.

## ORDER

ROBERT C. BROOMFIELD, Senior District Judge.

### *Introduction*

In 2005, the Arizona State Legislature criminalized human smuggling. *See* Ariz. Rev.Stat. ("A.R.S.") § 13–2319. Thereafter, the Maricopa County Attorney's Office ("MCAO") interpreted that human smuggling statute, in combination with Arizona's conspiracy statutes, as giving it the prosecutorial discretion to charge and prosecute non-smuggling migrants for conspiring to transport themselves within Maricopa County. Accordingly, the Maricopa County Sheriff's Office ("MCSO") began arresting and detaining migrants for that crime. This lawsuit is a direct challenge to the foregoing, which the parties refer to, as will the court, as the Maricopa Migrant Conspiracy Policy (the "Policy").

Currently pending before the court are defendants' (Doc. 119) and plaintiffs' (Doc. 121) competing motions for summary judgment pursuant to Fed.R.Civ.P. 56. The primary issue which these summary judgment motions raise is whether federal law preempts and renders invalid the Policy.[1] The plaintiffs' second motion for class certification pursuant to Fed.R.Civ.P. 23 (Doc.

---

1. Given the court's intimate familiarity with this action and because the issues have been fully briefed, in its discretion the court denies the parties' request for oral argument as it would not aid the decisional process. *See* Fed.R.Civ.P. 78(b); *Partridge v. Reich,* 141 F.3d 920, 926 (9th Cir.1998).

**378**

122)[2] is also currently pending before the court.

### Background

An examination of the parties' statements of facts and controverting statements of facts, reveals that there is little complete agreement between them. Most of the parties' objections are not well-taken though; and they obfuscate rather than sharpen the factual record.

A court "may only consider admissible evidence in ruling on a motion for summary judgment." *Ballen v. City of Redmond,* 466 F.3d 736, 745 (9th Cir.2006) (citation omitted). However, " 'objections to evidence ... [as] irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself.' " *Harris Technical Sales, Inc. v. Eagle Test Sys., Inc.,* 2008 WL 343260, at *3 (D.Ariz. Feb. 5, 2008) (quoting *Burch v. Regents of the Univ. of Cal.,* 433 F.Supp.2d 1110, 1120 (E.D.Cal.2006)). Many of the parties' objections are to relevancy. Such objections are " 'redundant' " though because a court " 'cannot rely on irrelevant facts[ ]' " in awarding summary judgment. *Huynh v. J.P. Morgan Chase & Co.,* 2008 WL 2789532, at *4 (D.Ariz. July 17, 2008) (quoting *Burch,* 433 F.Supp.2d at 1119). " 'A court can award summary judgment only when there is no genuine dispute of *material* fact.' " *Id.* (quoting *Burch,* 433 F.Supp.2d at 1119) (emphasis in original).

Other objections are that the proffered evidence is argumentative or constitutes an improper legal conclusion. These types of objections are "superfluous" in this context, however, because such statements " 'are not facts and likewise will not be considered on a motion for summary judgment.' " *Id.* (quoting *Burch,* 433 F.Supp.2d at 1119 (citation omitted)). Thus, insofar as the parties' objections are duplicative of the summary judg-

ment standard, the court sees no need to expressly rule on each.

There are two objections which merit specific consideration, however. The defendants are objecting to the plaintiffs' second statement of fact which, in turn, is based upon a document entitled "[Criminal Justice–Sheriff–Human Smuggling Enforcement] Opinion No. 2005–002[,]" dated September 29, 2005. Pls.' Exh. 5 (Doc. 121–2) at 213–219.[3] This unsigned document purports to be a letter from former Maricopa County Attorney Andrew P. Thomas to defendant Sheriff Joseph M. Arpaio. *See id.* Based upon this letter, the plaintiffs offer the following statement of "fact[:]" "On September 29, 2005, [the then] defendant County Attorney announced that his office would prosecute not only actual *coyotes,* but also nonsmuggler migrants—'people who are trying to enter into this country' and whom, in the legislature's view, actual smugglers 'exploit'—who agree to pay for their own transport on the theory that such migrants have conspired to violate § 13–2319." Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment ("Pls.' SOF") (Doc. 121–1) at 3:16–21 (citations omitted). The plaintiffs also rely upon the September 29, 2005, document as the source of the Policy. *See id.* at 3:24–25 ("This [opinion letter] initiated the ... MMCP at issue[.]")

Objecting to this statement of fact, and the predicate document, the defendants assert that the latter lacks foundation because it is unsigned. The defendants further assert that that unsigned document cannot "serve as an admission by a party opponent[ ]" in the absence of any testimony by either its supposed author, non-party Thomas, or its alleged recipient, defendant Arpaio. Defendants' Response to Plaintiffs' Statement of Facts in Support of Plaintiffs' Motion for Summary Judgment and Controverting Statement of Facts ("Defs.' Resp. SOF") (Doc. 129) at 3:13–14, ¶ 2.

---

2. This court previously denied plaintiffs' first motion for class certification without prejudice to renew. *We Are America/Somos America Coalition of Arizona v. Maricopa Co. Bd. of Supervisors,* 2007 WL 2775134, at * 8 (D.Ariz. Sept.21, 2007) *("WAA/SACA I").*

3. For uniformity and ease of reference, all citations to page numbers of docketed items are to the page assigned by the court's case management and electronic case filing (CM/ECF) system.

■ Documentary evidence submitted on a summary judgment motion "must be authenticated and attached to a declaration wherein the declarant is the person through whom the exhibits could be admitted into evidence." *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir.2007) (citation omitted); *see also Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir.2002) (citations and footnote omitted) ("Authentication is a condition precedent to admissibility" and "unauthenticated documents cannot be considered in a motion for summary judgment.") The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Orr*, 285 F.3d at 773. This authentication requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims[,]" Fed.R.Evid. 901(a), or if the document is self-authenticating pursuant to Fed.R.Evid. 902. The plaintiffs have shown neither. Therefore, the court will not consider the unsigned September 29, 2005, letter due to a lack of foundation.

■ For substantially similar reasons, the court also will not consider what purports to be "Minutes of the Committee on Judiciary re: H.B. 2539, Arizona House of Representatives, 47th Legislature, First Regular Session (February 10, 2005)." Pls.' SOF (Doc. 121–1) at 3:14–17. Attempting to show legislative intent, the plaintiffs recite from these Minutes several times. The Minutes themselves are not part of the record, however; nor have they been authenticated in any way.

Notwithstanding the parties' objections, at bottom, the undisputed facts pertaining to the pending summary judgment motions are straightforward and few. In 2005, Arizona criminalized human smuggling, making it a class 4 felony for a "person to intentionally engage in the smuggling of human beings for profit or commercial purpose." A.R.S. § 13–2319(A)–(C)(1)-(2) (Supp.2010)[4]. The statutory definition of "[s]muggling of human beings" is "transportation, procurement of transportation or use of property or real property by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or have attempted to enter, entered or remained in the United States in violation of law." A.R.S. § 13–2319(F)(3).

Significantly, the defendants do not dispute either the existence of the Policy or its implementation. Indeed, they expressly acknowledge that "[s]ince March of 2006, the [MCAO] has reserved the prosecutorial discretion under Arizona law to charge and prosecute persons for the state crime of conspiracy under A.R.S. § 13–1003 to violate Arizona's human smuggling statute, A.R.S. § 13–2319." Defendants' Motion for Summary Judgment ("Defs.' SJM") (Doc. 119) at 1:27–2:2. Along those same lines, the defendants further acknowledge that the MCSO "also enforces § 13–1003 as applied to § 13–2319 by arresting individuals for, and detaining them under, the criminal charge of conspiring to violate Arizona's human smuggling statute when probable cause exists to do so." *Id.* at 2:5–7. Defendants also point out that A.R.S. § 13–1006(B) recognizes that a person may commit conspiracy to commit an offense, even if that person cannot be convicted of the offense itself.[5]

By June 2011, in accordance with the Policy, MCSO "deputies had arrested at least 1,800 non-smugglers for conspiring to violate § 13–2319." Pls.' SOF (Doc. 121–1) at 3, ¶ 3 (citations omitted); *see also* Defs.' Resp. SOF (Doc. 129) at 3, ¶ 3 (admit). And, "[a]s

---

4. Section 13–2319 was amended by section four of "Support Our Law Enforcement and Safe Neighborhoods Act," as amended by H.B. 2162 ("S.B. 1070"). That amendment, which is not relevant here, "made only a minor change to Arizona's preexisting human smuggling statute, i.e., section 13–2319[,]" and did not affect its substantive scope. *See We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F.Supp.2d 1084, 1086 n. 1 (D.Ariz. 2011) (*"WAA/SACA IV"*) (citation omitted).

5. That statute provides as follows:

It is not a defense to a prosecution for solicitation or conspiracy that the defendant is, by definition of the offense, legally incapable in an individual capacity of committing the offense that is the object of the solicitation or conspiracy.

A.R.S. § 13–1006(B).

of March 2010, the [MCAO] had prosecuted 1,357 non-smugglers for conspiracy to violate § 13–2319." *Id.* at 4, ¶ 4 (citation omitted); *see also* Defs.' Resp. SOF (Doc. 129) at 4, ¶ 4 (admit). At his August 23, 2012, deposition, Maricopa County Sheriff Arpaio confirmed that the MCSO is continuing to arrest "co-conspirators" and that the MCAO continues to prosecute them. Pls.' Exh. 1 (Doc. 121–2) at 36:5–10.

The First Amended Complaint ("FAC") alleges four separate causes of action. Significantly however, believing they are "clearly entitled" to summary judgment "on their first claim for relief (preemption)[,]" the plaintiffs are "reced[ing] from their remaining [three] claims[.]" Plaintiffs' Responsive Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Resp.") (Doc. 126) at 16:27–28, n. 5. This obviates the need to consider much of the defendants' summary judgment motion, which addressed all four claims. What remains, as mentioned at the outset, is the vigorously disputed issue of federal preemption. The parties each argue their entitlement to summary judgment on this issue. The defendants argue that the Policy is not preempted by federal immigration law, whereas the plaintiffs argue that it is preempted. Additionally, the plaintiffs are seeking certification of two alternative classes, as more fully discussed herein.

### Discussion

"Bringing a class certification motion together with a Rule 56 motion[,]" as the plaintiffs have done, "is consistent with the Federal Rules of Civil Procedure." *See Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015, 1032 (9th Cir.2012) (citing cases). At the outset, though, the court must determine which motion to resolve first. In their summary judgment motion, the defendants argue, *inter alia,* that each of the remaining named plaintiffs [6] "lack standing to bring this suit for equitable relief." Defs.' SJM (Doc. 119) at 15:17. Similarly, in opposing class certification, the defendants also argue that the two municipal taxpayer plaintiffs, Dawn Haglund and David [7] Lujan, lack standing.

If the defendants are correct, and none of the plaintiffs have standing, then this court would not have subject matter to consider the merits, including class certification. *See Righthaven LLC v. Hoehn,* 716 F.3d 1166, 1172 (9th Cir.2013) ("In the absence of standing, a federal court 'lacks subject matter jurisdiction over the suit.' ") (quoting *Cetacean Cmty. v. Bush,* 386 F.3d 1169, 1174 (9th Cir.2004)) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Therefore, the court will first address the parties' summary judgment motions. *See Tech v. U.S.,* 271 F.R.D. 451, 454 (M.D.Pa.2010) ("[p]rior to rendering a disposition on the Plaintiff's class certification motion, [the court first consider[ed] the United States'[ ] motion to dismiss ... for lack of subject matter jurisdiction ..., asserting that Tech lacks standing[ ]"); *cf. Evon,* 688 F.3d at 1032 ("While Rule 23 does not require a district court to fully consider the merits of the plaintiffs' claims, addressing the merits of the claims in a related summary judgment motion can have a substantial bearing on the required Rule 23 determinations.")

### I. Summary Judgment Motions

The court assumes familiarity with what has sometimes been referred to as the *Celotex* trilogy wherein the Supreme Court clarified and refined the standards for deciding Rule 56 summary judgment motions. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106

6. In *We Are America/Somos America Coalition of Arizona v. Maricopa Co. Bd. of Supervisors,* 594 F.Supp.2d 1104 (D.Ariz.2009) (*"We Are America II"*), based upon *Younger* abstention, this court held that it lacked jurisdiction to consider the claims of the six Mexican Nationals—a holding which the Ninth Circuit affirmed. *We Are America/Somos America Coalition of Arizona v. Maricopa Co. Bd. of Supervisors,* 386 Fed.Appx. 726, 727 (9th Cir.2010).

7. The FAC's caption accurately names David Lujan as a plaintiff, but later it incorrectly refers to him as "Steve" Lujan *Compare* FAC (Doc. 45) at 1:23 *with* FAC (Doc. 45) at 8:13, ¶ 13. Despite this misidentification, it is clear that David Lujan and "Steve" Lujan are the same plaintiff.

S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no need to repeat the entire body of summary judgment case law which has developed since then. That is especially so given that there are no material facts in dispute and the pending motions turn on legal issues, making them proper for resolution pursuant to Fed. R.Civ.P. 56. *See Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

■ The summary judgment standards do not "change when the parties file cross-motions for summary judgment: the court must apply the same standard and rule on each motion independently because the granting of one motion does not necessarily translate into the denial of the other unless[,]" as here, "the parties rely on the same legal theories and same set of material facts." *See Feezor v. Excel Stockton, LLC,* 2013 WL 2485623, at *2 (E.D.Cal. June 10, 2013) (citing *Pintos v. Pac. Creditors Ass'n,* 605 F.3d 665, 674 (9th Cir.2010), *cert. denied sub nom. Experian Info. Solutions, Inc. v. Pintos,* 562 U.S. ——, 131 S.Ct. 900, 178 L.Ed.2d 747 (2011)).

### A. Standing

Defendants assert that a party's standing "is a fundamental *threshold* inquiry[,]" while simultaneously asserting that plaintiffs' lack of standing is a *"final* reason" for granting summary judgment. Defs.' SJM (Doc. 119) at 15:16 (citation omitted) (emphasis added). If the plaintiffs lack standing then, as previously explained, this court would lack subject matter jurisdiction. Therefore, even though lack of standing is the defendants' last asserted basis for seeking summary judgment, the court must address that argument first.

Earlier in this litigation the defendants brought a "strictly facial[ ]" challenge to standing, arguing for dismissal pursuant to Fed.R.Civ.P. 12(b)(1). *WAA/SACA IV,* 809 F.Supp.2d at 1089 and n. 4. Denying that motion, this court found that the plaintiffs had sufficiently alleged organizational standing as to We Are America/Somos America Coalition of Arizona ("WAA/SACA") and the American Hispanic Community Forum ("AHCF"),[8] and municipal taxpayer standing as to plaintiffs David Lujan and LaDawn Haglund.[9]

Now, however, the standing issue is before the court in a different procedural posture—on a summary judgment motion. Essentially the defendants are arguing that the plaintiffs' evidence is insufficient to confer standing upon any of them because their grievances are too general to establish the requisite Article III injury in fact. The plaintiffs retort that "the uncontroverted evidence establishes both organizational and taxpayer plaintiffs' standing." Pls.' Resp. (Doc. 126) at 8:19–20 (emphasis omitted).

■ Mere allegations were sufficient to establish standing with respect to the defendants' earlier motion to dismiss, but at this juncture more is required. "In response to a summary judgment motion ... to establish Article III standing, a plaintiff can no longer rest on 'mere allegations' but must set forth by affidavit or other admissible evidence 'specific facts' as delineated in Federal Rule of Civil Procedure 56(e) as to the existence of such standing." *Gerlinger v. Amazon.com Inc.,* 526 F.3d 1253, 1255–1256 (9th Cir.2008) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

### 1. Municipal Taxpayers[10]

■ " '[I]mproper expenditure of public funds' is the crux of any claim that a municipal taxpayer satisfies the injury in fact prong

---

**8.** This court also found that the FAC adequately alleged organizational standing as to plaintiff Friendly House. Since then, however, the parties have stipulated to the dismissal of Friendly House and others, leaving only two organizational plaintiffs. *See* Ord. (Doc. 109) at 2.

**9.** This court previously also found that the FAC adequately alleged municipal taxpayer standing as to plaintiffs Kyrsten Sinema and Cecilia Men-

jivar. Since then, however, the parties have stipulated to their dismissal, leaving Haglund and Lujan as the municipal taxpayer plaintiffs. *See* Ord. (Doc. 109) at 2.

**10.** The court incorporates by reference as if fully set forth herein its discussion of the governing standing principles and ensuing analysis in *WAA/SACA IV,* 809 F.Supp.2d at 1089–1112.

of constitutional standing[,]" as fully discussed in *WAA/SACA IV*, 809 F.Supp.2d at 1108 (citing *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir.1991)). "As recently as 2008, the Ninth Circuit has reaffirmed this view." *Id.* (citing *Barnes–Wallace v. City of San Diego*, 530 F.3d 776, 786 (9th Cir.2008)) ... ("[M]unicipal taxpayers must show an expenditure of public funds to have standing.") "In fact, the premise that an 'unconstitutional expenditure of government funds can itself be injury enough to confer municipal-taxpayer standing' is not unremarkable as a general proposition." *Id.* (quoting *Smith v. Jefferson County Bd. of School Com'rs*, 641 F.3d 197, 213 (6th Cir.2011)) (citation omitted) (Sixth Circuit noted that its "sister circuits[,]" including the Ninth in *Cammack*, "all agree" with that general proposition).

■ Succinctly put, Article III standing comprises three elements: (1) injury in fact; (2) causal connection; and (3) redressability. *See Barnum Timber Co. v. U.S. Environmental Protection Agency*, 633 F.3d 894, 897 (9th Cir.2011). Given that the defendants are once again confining their argument to the injury in fact element, presumably they are conceding, as this court previously found, that the municipal taxpayer [11] plaintiffs have shown the latter two standing elements. *See WAA/SACA IV*, 809 F.Supp.2d at 1105. The court will confine its analysis accordingly.

■ The defendants make the blanket assertion that municipal taxpayer plaintiff LaDawn Haglund lacks standing because her "injury ... is simply a generalized grievance that she does not like any tax money, ...,"" being used for governmental decisions she disagrees with as a matter of public policy, such as the Policy." Defs.' SJM (Doc. 119) at 16:26–17:2 (citation omitted). This is the sum total of the defendants' standing "argument" as to plaintiff Haglund. Overlooking the lack of any analysis, the court is compelled to comment upon the liberties which the defendants have taken in describing the portion of plaintiff Haglund's deposition to which they cite.

In that snippet, plaintiff Haglund was explicitly asked, "[W]hat is the injury to you because of th[is] [P]olicy[?]" Defs.' Exh. C (Doc. 120–1) at 18:5–6. Directly responding, plaintiff Haglund stated, "[M]y "tax money is being used to house and prosecute and detain non-criminals, in my view, economic migrants and treating them as criminals." *Id.* at 18:13–15. Describing this use of her tax money as "a misuse in many ways[,]" plaintiff Haglund further testified that given the "federal rules ... for dealing with immigrants, ... using ... my tax dollars to prosecute economic migrants detracts from prosecuting real criminals." *Id.* at 18:16–20.

This testimony cannot be reasonably interpreted to support defendants' characterization thereof. Plainly, the foregoing does not show a *"generalized* grievance that [plaintiff Haglund] does not like *any* tax money ... being used for *governmental decisions she disagrees with* as a matter of public policy[.]" *See* Defs.' SJM (Doc. 119) at 16:27–17:1 (citation omitted) (emphasis added). Rather, plaintiff Haglund responded to a narrowly tailored question regarding any injury to her as a result of the Policy, and she responded accordingly. She was not asked about any "governmental decisions" beyond the Policy. Obviously then, there is no way to know from the cited testimony how plaintiff Haglund views other governmental decisions as to the expenditure of her tax dollars. Even assuming the existence of such testimony, it would be irrelevant. Consequently, the court gives no credence to the defendants' depiction of plaintiff Haglund's testimony, which does nothing to advance their argument that she lacks standing.

Not only is there no factual basis for that defense argument, but there is no legal basis for it either. As this court previously found, the municipal taxpayers sufficiently alleged the requisite injury in fact by alleging their status as municipal taxpayers and the improper expenditure of municipal funds. *See WAA/SACA IV*, 809 F.Supp.2d at 1104–1109. The plaintiffs' evidence offered in support of

---

**11.** Because it is no longer necessary to distinguish between federal, state and municipal taxpayers, hereinafter all references to taxpayers shall be read as referring to the municipal taxpayer plaintiffs.

their summary judgment motion substantiates the FAC's allegations as to plaintiff Haglund's standing as a municipal taxpayer.

First, plaintiff Haglund's status as a Maricopa County taxpayer is undisputed. Since 2005, she has been a Maricopa County resident. *See* Pls.' Supp. Exh. 19 (Doc. 126–3) at 68:11–16. From 2005 until 2011, she owned real property in Maricopa County and paid property taxes thereon. *Id.* at 68:17–23. In October 2011, plaintiff Haglund began renting a house in Maricopa County. *Id.* at 69:6–13. She is charged for and pays property taxes and rent on that residence. *Id.* at 69:14–70:14. By statute, such taxes are paid to the treasury of Maricopa County which "shall apportion and apply the[m] ... to the several special and general funds as provided by law." *See* A.R.S. § 11–492.

In addition to property taxes, as a Maricopa County resident, plaintiff Haglund pays a "special sales tax[ ]"—the "Jail Excise Tax." *See* Pls.' Supp. Exh. 20 (Doc. 126–3) at 90; *see also* Pls.' Exh. 1 (Doc. 121–2) at 39:15–17 (Defendant Arpaio testified that "the operations of the [County] jails come from a tax that was passed by the people of this [C]ounty several years ago[ ]"—"a special budget[.]") This Jail Excise Tax is used to "fund construction and operation of adult and juvenile detention facilities[ ]" where defendants detain, among others, those arrested pursuant to the Policy. *See* Pls.' Supp. Exh. 20 (Doc. 126–3) at 90. In fiscal year 2011, Maricopa County collected $112,451,802.00. *Id.* This Tax will continue until approximately 2027. *See id.*

Besides establishing that plaintiff Haglund is a Maricopa County taxpayer, the evidence bears out the FAC's allegations that County funds are being expended to carry out the Policy. County taxes, such as those paid by plaintiff Haglund, are used for a variety of MCSO's activities related to the Policy, as defendant Arpaio admits. As defendant Arpaio admitted, those activities include: (1) "training MCSO deputies to detect and arrest persons who conspire to transport themselves in violation of A.R.S. § 13–2319[;]" (2) "transport[ing] persons arrested for conspiring to transport themselves in violation of" that statute; and (3) "jail[ing] persons arrested for conspiring to transport themselves in violation of A.R.S. § 13–2319." Pls.' Supp. Exh. 11 (Doc. 126–2) at 77:12–14, ¶ 63; 77:16–18, ¶ 64; and 77:9–10, ¶ 62.

County taxes are likewise being expended by the MCAO to carry out the Policy, as defendant Maricopa County Attorney Montgomery admits. The defendant Maricopa County Board of Supervisors "appropriates funds for the operations of the MCAO." Pls.' Supp. Exh. exh. 12 (Doc. 126–2) at 93:27–94:1, ¶ 72. The MCAO, in turn, "spends tax revenues to prosecute persons for conspiring to transport themselves in violation of A.R.S. § 13–2319[,]" as well as for training personnel to conduct such prosecutions, as defendant Montgomery also admits. *Id.* at 93:4–10, ¶¶ 68–69.

Furthermore, the defendants concede that "[b]y June 10, 2011, [MCSO] deputies had arrested at least 1,800 non-smugglers for conspiring to violate § 13–2319[;]" and "[a]s of March 2010, the [MCAO] had prosecuted 1,357 non-smugglers" for that same crime. Pls.' SOF (Doc. 121–1) at 3:26–4:7, ¶¶ 3 and 4 (citations omitted); *see also* Defs.' Resp. SOF (Doc. 129) at 3:15–16. It costs $91.73 per day to detain an individual in the Maricopa County jail.[12] Pls.' Supp. Exh. 18 (Doc. 126–3) (Maricopa Co. Justice System Annual Activities Report FY 2011) at 44. This evidence confirms the expenditure of plaintiff Haglund's County taxes to arrest, detain, and prosecute individuals pursuant to the Policy.

In short, plaintiffs' evidence fully corroborates the FAC's allegations that Ms. Haglund is a municipal taxpayer, as well as the expenditure of Maricopa County taxes in connection with the Policy. There is thus no dispute that she satisfies the injury in fact prong of municipal taxpayer standing—the only element with which the defendants take issue. *Cf. Page v. TriCity Healthcare District,* 860 F.Supp.2d 1154, 1165 (S.D.Cal.2012) (no municipal taxpayer standing where plaintiff did not "show[ ] an expenditure of public

---

12. This figure was derived by dividing the total number of jailed adults in fiscal year 2011 by the total spent for detaining those adults. *See* Pls.'

Controverting SOF, exh. 18 thereto (Doc. 126–3) at 44.

funds[ ]" and "provided no evidence indicating how much money had been spent" regarding the challenged conduct "or where the funds came from[ ]").

Tellingly, in the face of this undisputed evidence, the defendants' reply is conspicuously silent on the issue of standing. The defendants do not contest plaintiffs' evidence or legal position in any way. For all of these reasons, the court finds that plaintiff Haglund has standing as a municipal taxpayer. Thus, the court denies this aspect of defendants' summary judgment motion.

There are no readily discernible differences between taxpayer plaintiffs Haglund and Lujan in terms of the evidence pertaining to their standing. Plaintiff Lujan is a Maricopa County resident of longstanding and "regularly pays taxes to Maricopa County, including, but not limited to, the ... Jail Excise Tax[.]" Pls'. Controverting SOF (Doc. 126–3), exh. 17 thereto (Lujan Decl'n) at 191, ¶ 2. And, the plaintiffs are proffering the same undisputed evidence outlined above to establish his standing as a taxpayer. *See* Pls.' Resp. (Doc. 126) at 9:11–10:26. Despite that, the defendants, inconsistently, are not challenging plaintiff Lujan's standing. Nonetheless, the evidence which supports a finding of taxpayer standing as to plaintiff Haglund supports the same finding as to plaintiff Lujan. Thus, both taxpayer plaintiffs have standing to pursue the preemption claim. *See Haro v. Sebelius*, 729 F.3d 993, 1001, 2013 WL 4734032, at *4 (9th Cir. Sept. 4, 2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)) ("[A] plaintiff must demonstrate standing for each claim[.]' ")

"[S]tanding is not dispensed in gross[,]" however. *Lewis v. Casey*, 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Therefore, the court's inquiry cannot end here. It also must decide whether the taxpayer plaintiffs have " 'standing ... for each form of relief sought.' " *See Haro*, 729 F.3d at 1001 (quoting *DaimlerChrysler*, 547 U.S. at 352, 126 S.Ct. 1854). The difference between the FAC and the plaintiffs' summary judgment motion, in terms of the relief sought, requires the court to first ascertain exactly what types of relief the plaintiffs are seeking.

In their prayer for relief, the plaintiffs are seeking declaratory and injunctive relief, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b). FAC (Doc. 45) at 28–29, ¶¶ 3–5. In their summary judgment motion, however, the plaintiffs are expanding the scope of the relief. Now, the plaintiffs are also seeking "to *make whole class members previously injured* by defendants detaining, arresting, and prosecuting non-smuggler migrants for conspiracy to transport themselves in violation of Ariz.Rev. Stat. § 13–2319[.]" Pls.' SJM (Doc. 121) at 3:5–9 (emphasis added). The plaintiffs' proposed summary judgment order reveals the nature of such relief. More specifically, the plaintiffs request that the "[c]onvictions secured against persons for conspiring to transport themselves, and no one else, in purported violation of Ariz.Rev.Stat. § 13–2319 are inconsistent with the Supremacy Clause, U.S. Const., Art. VI, cl. 2, and are accordingly declared null and void." Proposed Summary Judgment Order (Doc. 123) at 2:2–5, ¶ 3.

The court will not consider whether the taxpayer plaintiffs (or, for that matter, the organizational plaintiffs) have standing to pursue this belated request for retrospective declaratory relief. In the first place, neither of the plaintiffs' two proposed class definitions includes putative class members who were "previously injured by" the Policy. *See id.* at 3:6. As plaintiffs themselves define it, their first proposed class is: "All individual who *are* ... stopped, detained, arrested, incarcerated, prosecuted, or penalized for conspiring to transport themselves, and themselves only, in violation of Ariz.Rev.Stat. § 13–2319[.]" Class Certification Mot. (Doc. 122) at 5:26–28 (emphasis added). The second proposed class pertains to municipal taxpayers. Thus, even assuming *arguendo* that the court were to grant class certification to both classes, by plaintiffs' own definition, neither would include "class members previously injured" by the Policy. *See* Pls.' SJM (Doc. 121) at 3:6.

The second reason for declining to consider whether any of the plaintiffs have stand-

ing to pursue retrospective declaratory relief is that this request is belated and has not been adequately addressed by the plaintiffs. The plaintiffs did not seek this form of relief in their FAC. In the final paragraph of the FAC, the plaintiffs do request the court to "[g]rant such further relief as [it] deems just." FAC (Doc. 45) at 29, ¶ 6. That boilerplate phrase is insufficient to put the defendants on notice that as part of this lawsuit the plaintiffs are asking this federal court to nullify potentially thousands of prior state court convictions.

Rule 54(c) does permit a court to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R.Civ.P. 54(c). The plaintiffs certainly have not shown their entitlement to this particular relief, however. They only mention it once in passing in their summary judgment motion, and then include it in a *proposed* order submitted in connection with that motion. The lack of any briefing on plaintiffs' supposed entitlement to retrospective declaratory relief is problematic because it is not a "predictable remedy" as to their preemption claim. *Contra Mueller v. Auker*, 2010 WL 2265867, at *5 (D.Idaho June 4, 2010) ("A predictable remedy for constitutional violations includes declaratory and injunctive relief[.]") Lastly, the court is concerned about possible prejudice to the defendants given that the plaintiffs' demand for this retrospective declaratory relief was explicitly raised for the first time in their proposed summary judgment order.

Having determined that the potential available relief in this case is prospective declaratory and injunctive relief, the court will next address whether the taxpayer plaintiffs have standing to seek such relief. " 'The standing formulation for a plaintiff seeking prospective injunctive relief' generally requires that the plaintiff's concrete injury be 'coupled with 'a sufficient likelihood that he will again be wronged in a similar way.' ' " *Haro*, 729 F.3d at 1001 (quoting *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir.2007)) (en banc) (quoting in turn *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). "In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief." *Bates*, 511 F.3d at 985 (citation omitted). That does not mean " ' 'that a favorable decision *will inevitably* redress [their injuries][.]' ' " *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir.2012) (quoting *Wilbur v. Locke*, 423 F.3d 1101, 1108 (9th Cir.2005)) (internal quotations omitted, emphasis and alterations in original) (quoting in turn *Graham v. FEMA*, 149 F.3d 997, 1003 (9th Cir.1998), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 130 S.Ct. 2323, 176 L.Ed.2d 1131 (2010))." Rather, the " ' '[p]laintiffs must show only that a favorable decision is *likely* to redress [their injuries][.]' ' " *Id.* That standard is met here.

The taxpayer plaintiffs have shown a concrete, "necessary injury—actual expenditure of tax dollars" *vis-a-vis* the Policy. *See Cammack v. Waihee*, 932 F.2d 765, 772 (9th Cir. 1991). Furthermore, the defendants admit that they "continue to . . . arrest and prosecute" persons for conspiring to transport themselves in violation of Arizona's human smuggling statute. *See* Pls.' SOF (Doc. 121–1) at 4:8–10, ¶ 5; *see also* Defs.' Resp. SOF (Doc. 129) at 3:17–4:6, ¶ 5. Therefore, the injury to the taxpayer plaintiffs continues unabated. Consequently, there is "a sufficient likelihood" that the taxpayer plaintiffs "will again be wronged in a similar way[,]" *i.e.*, by having their County taxes expended to enforce a Policy which they maintain federal law preempts. *See Haro*, 729 F.3d at 1001 (internal quotation marks and citations omitted).

Additionally, the claimed threat of injury—the misuse of the taxpayers' County taxes to fund the Policy—is likely to be remedied by prospective injunctive and declaratory relief. As plaintiff Lujan succinctly put it, enjoining the Policy would mean that his "local tax payments would no longer be diverted to th[e] unlawful purpose" of the Policy. Pls.' Supp. Exh. 17 (Doc. 126–3) at 42, ¶ 4. This is fully consistent with the long held view, as laid out in *WAA/SACA IV*, 809 F.Supp.2d 1084, that " '[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not in-

appropriate.'" *Id.* at 1106 (quoting *Frothingham v. Mellon,* 262 U.S. 447, 486–487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)). For all of these reasons, the court finds that plaintiffs Haglund and Lujan have municipal taxpayer standing as to the preemption claim and as to the prospective equitable relief sought. Thus, the court denies this aspect of defendants' summary judgment motion.

■ If the court finds, as it has, that the municipal taxpayer plaintiffs have standing, then, they contend (and the defendants do not disagree), that there is no need to consider whether the organizational plaintiffs also have standing. Plaintiffs base their contention upon the "general rule [in] federal court suits with multiple plaintiffs ... that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *See Melendres v. Arpaio,* 695 F.3d 990, 999 (9th Cir.2012) (quoting *Leonard v. Clark,* 12 F.3d 885, 888 (9th Cir.1993)). In *Melendres,* Latino motorists and passengers and the organization Somos America, brought an action under § 1983 alleging that the MCSO and Sheriff Arpaio, among others, engaged in a policy of racially profiling Latinos in connection with traffic stops. Applying that general rule in *Melendres,* the Ninth Circuit, after finding that Latino motorists and passengers had standing, expressly declined to "address whether Somos America, an organization, met the requirements for associational standing." *Id.*

This court did depart from that general rule in *WAA/SACA IV,* 809 F.Supp.2d at 1090–1094, as the parties are well aware. The standing issue is before the court now in a different procedural posture—on a motion for summary judgment motion, not on a motion to dismiss. Consequently, as it strongly intimated in *WAA/SACA IV,* having found that the municipal taxpayer plaintiffs have standing as to the preemption claim and for

the relief sought, the court will not address whether the WAA/SAC and AHFC, the organizational plaintiffs, also have standing. *See id.* at 1093 ("By contrast, if defendants were moving for summary judgment on the dual grounds of lack of standing and the merits, plaintiffs' argument that the court need not reach the issue of organizational plaintiffs' standing, if it finds that the taxpayers have standing, would carry far more weight.") It is simply not necessary.

### B. Federal Preemption[13]

■ The plaintiffs are pursuing only their "Federal Preemption" claim, opting for voluntary dismissal of their other claims. *See* FAC (Doc. 45) at 25:25. The plaintiffs allege that the Policy "is an impermissible attempt by state actors to regulate immigration, and as such unlawfully usurps the federal government's exclusive power to regulate immigration in violation of the United States Constitution"[14] and the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ("INA"). *Id.* at 25:28–26:2, ¶ 53. In moving for summary judgment on this claim, the plaintiffs argue that federal law impliedly preempts the Policy. Contrariwise, the defendants argue that federal law does *not* impliedly preempt the Policy. The defendants thus assert that they, and not the plaintiffs, are entitled to summary judgment on the issue of field preemption.

Before considering the parties' preemption arguments, there is one prefatory issue. From the inception of this lawsuit, the plaintiffs made a seemingly deliberate choice to challenge only the Policy ___ and not A.R.S. § 13–2319. The defendants are taking the position, however, that because the plaintiffs are not attacking the constitutionality of A.R.S. § 13–2319, or arguing that federal law preempts that state statute, they cannot ar-

---

**13.** As the defendants acknowledge, although the preemption issue arose earlier in this case in a different context, the court "has not dispositively ruled on whether the Policy is preempted by federal immigration law." Defs.' SJM (Doc. 119) at 2:19, n. 1. Therefore, nothing about those prior decisions precludes revisiting the preemption anew. This is all the more so given: (1) the completion of discovery, and hence a more fully developed record; (2) the federal preemption

issue is squarely raised by the parties' summary judgment motions; and (3) the evolving state of the law in this area.

**14.** The constitutional basis for plaintiffs' argument is Congress' power "[t]o establish an uniform Rule of Naturalization[,]" and its power "[t]o regulate Commerce with foreign Nations[.]" *See* U.S. Const. Art. I, § 8, cls. 3–4.

gue that federal law preempts the Policy itself. The defendants offer no legal support for this novel proposition. The allegations of plaintiffs' FAC and the legal theories which they pursue are their prerogative. The court, therefore, agrees with the plaintiffs that they may challenge the Policy as conflict and field preempted "regardless of § 13–2319's facial constitutionality." *See* Pls.' Reply (Doc. 134) at 9:20–21.

■ "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona v. U.S.*, 567 U.S. ——, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012) (quoting U.S. Const. Art. VI, cl. 2). It is thus "[a] fundamental principle of the Constitution ... that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (citations omitted). Moreover, on "the subject of immigration and the status of aliens[,]" "[t]he Government of the United States has broad, undoubted power[.]" *Arizona*, 132 S.Ct. at 2498 (citations omitted); *see also DeCanas v. Bica*, 424 U.S. 351, 354, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), *superseded by statute on other grounds as stated in Chamber of Comm. v. Whiting*, 563 U.S. ——, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (The "[p]ower to regulate immigration is unquestionably exclusively a federal power.") Indeed, that power is "well settled[,]" reflective of, among other things, the fact that "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona*, 132 S.Ct. at 2498 (citations omitted).

This federal immigration power derives, in part, from the federal government's "constitutional power to 'establish an uniform Rule of Naturalization,' ..., and its inherent power as sovereign to control and conduct relations with foreign nations[.]" *Id.* (citations omitted). That said, the Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power[.]" *DeCanas*, 424 U.S. at 355, 96 S.Ct. 933 (citations omitted).

■ Federal preemption can be either express or implied. *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Implied preemption is the only issue which these summary judgment motions raise, however. Implied preemption comprises two, albeit "not rigidly distinct[,]" subcategories,—field and conflict preemption. *Crosby*, 530 U.S. at 372 n. 6, 120 S.Ct. 2288 (internal quotation marks and citation omitted). Field preemption precludes States "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S.Ct. at 2501 (citation omitted). Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility[.]" *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). It can also occur in "those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'" *Arizona*, 132 S.Ct. at 2501 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). In the present case, the parties' conflict preemption arguments center on actual and obstacle preemption, as opposed to impossibility. The court will similarly confine its analysis.

■ "There are 'two cornerstones' of preemption jurisprudence." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51 (2009)). First, "[r]egardless of the type of preemption involved ... '[t]he purpose of Congress is the ultimate touchstone of pre-emption analysis.'" *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1003 (9th Cir.2013) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (internal quotation marks omitted)). Second, a court "should assume that 'the historic

police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *See Arizona,* 132 S.Ct. at 2501 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)) (other citation omitted). With these principles firmly in mind, the court will first consider whether federal law, and more particularly the INA, preempts the Policy.

### 1. Field Preemption

The crux of the defendants' field preemption argument is the latter principle. That is, the defendants argue that they should prevail on the field preemption issue because the plaintiffs cannot "prove ... that it was 'the **clear and manifest** purpose of Congress' to oust state power from the field" of alien smuggling. Defs.' SJM (Doc. 119) at 8:25–9:1 (citing, *inter alia, DeCanas,* 424 U.S. at 357, 96 S.Ct. 933) (emphasis added by defendants). On the other hand, the plaintiffs argue that because Congress "fully regulates conspiracies to transport unauthorized entrants[,]" the Policy is field preempted. Pls.' SJM (Doc. 121) at 10:5–6. In making this argument, the plaintiffs rely upon the Supreme Court's rationale in *Arizona,* 132 S.Ct. 2492. Pls.' SJM (Doc. 121) at 10:7. There, the Supreme Court held, *inter alia,* that because "the Federal Government has occupied the field of alien registration[,]" § 3 of S.B. 1070, which made it a state misdemeanor to fail to comply with federal alien registration requirements, was field preempted. *Id.* at 2502 (citations omitted).

The plaintiffs also heavily rely upon two Eleventh Circuit decisions—*Georgia Latino Alliance for Human Rights v. Gov. of Georgia,* 691 F.3d 1250, 1256 (11th Cir.2012) ("*GLAHR*"); and *United States v. Alabama,* 691 F.3d 1269, 1285 (11th Cir.2012), *cert. denied,* 569 U.S. ——, 133 S.Ct. 2022, 185 L.Ed.2d 905 (Apr. 29, 2013). As part of sweeping immigration reform legislation in 2011, Georgia and Alabama criminalized a variety of activities pertaining to unauthorized or illegal aliens, including transporting, concealing or harboring such aliens. In *GLAHR,* the Eleventh Circuit affirmed a district court's finding that those Georgia statutes were field preempted by the INA's criminal provisions, particularly 8 U.S.C. § 1324. *GLAHR,* 691 F.3d at 1265–1267; *see also Alabama,* 691 F.3d at 1285–1287 (applying *GLAHR*'s reasoning to finding similar Alabama statutes field preempted); *Valle del Sol v. Whiting,* 2012 WL 8021265, at *5 (D.Ariz. Sept. 5, 2012)[15] (adopting the Eleventh Circuit's rationale, and holding that § 5 of S.B. 1070, Arizona's counterpart to the statutes at issue in *GLAHR* and *Alabama,* was field preempted).

Maintaining that "[t]here is no principled way to distinguish" the Policy from the state statutes at issue in *Arizona, GLAHR, Alabama,* and *Valle del Sol,* the plaintiffs argue that those cases are determinative of the field preemption issue herein. *See* Pls.' SJM (Doc. 121) at 11:7. The defendants' rejoinder is that the Policy is "materially and substantively different" from the challenged statutes in the cases just listed. Defs.' Reply (Doc. 132) at 4:4–5. Based upon those claimed differences, the defendants argue that none of the cases upon which the plaintiffs are relying apply to the field preemption issue now before this court. The parties' strong dispute as to the applicability of *Arizona* and the Eleventh Circuit's decisions in *GLAHR* and *Alabama* require closer examination of each.

In *Arizona,* to determine whether § 3 of S.B. 1070 intruded on the field of alien registration, the Supreme Court began by reiterating that "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona,* 132 S.Ct. at 2501 (citation omitted). The Supreme Court also recited the well settled rule that "[t]he intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' *or* where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same sub-

---

**15.** This appeal was argued and submitted in the Ninth Circuit on April 2, 2013. *Valle del Sol v. Whiting,* No. 12–17152. A decision has yet to be issued.

ject.' " *Id.* (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. 1146) (other citation omitted) (emphasis added).

Examining the history of federal alien registration requirements against that legal backdrop, the *Arizona* Court held that the federal government has occupied that field because "[t]he federal statutory directives provide a full set of standards governing alien registration, including punishment for noncompliance[,] ... designed as a harmonious whole." *Id.* (internal quotation marks and citation omitted). In such a case, "[w]here Congress occupies an entire field," the Supreme Court found that "even complementary state regulation is impermissible." *Arizona,* 132 S.Ct. at 2502. Such state regulation is "impermissible" because "[f]ield preemption reflects a congressional decision to foreclose *any* state regulation in the area, even if it is parallel to federal standards." *Id.* (citation omitted) (emphasis added).

The defendants assert that the plaintiffs' "heavy reliance" upon *Arizona* is "mistaken[,]" as the Supreme Court's "analysis[ ] is not controlling." Defs.' Resp. (Doc. 128) at 2:12 (emphasis omitted); Defs.' Reply (Doc. 132) at 3:6. The main basis for this defense argument is the difference in subject matter. Unlike the present case involving alien smuggling, the portion of *Arizona* which the plaintiffs invoke dealt with alien registration, and it has long been held "that the Federal Government ... occupie[s]" that field. *See Arizona,* 132 S.Ct. at 2502 (citations omitted). This distinction does not render *Arizona* any less applicable here. That is because, as discussed next, in *GLAHR* the Eleventh Circuit soundly reasoned, and this court agrees, that *Arizona* "provides an instructive analogy" even outside the realm of alien registration. *See GLAHR,* 691 F.3d at 1264. In other words, *Arizona'*s significance lies not in its subject matter but because it provides a useful framework for examining preemption in the context of federal immigration.

Broadly stated, Georgia enacted statutes criminalizing the transport, concealment and harboring of illegal aliens, as earlier mentioned. When confronted with the issue of whether those statutes were preempted by the INA, the Eleventh Circuit looked first to the text of 8 U.S.C. § 1324 to ascertain Congressional intent. Section 1324 creates several discrete crimes with respect to unlawfully present aliens. That statute makes it a federal crime for any person to bring an alien into the United States; to "transport or move an unlawfully present alien within the United States; to conceal, harbor, or shield an unlawfully present alien from detection; or to encourage or induce an alien to come to, enter, or reside in the United States." *Id.* at 1263 (citation, internal quotation marks and footnote omitted). It is also unlawful pursuant to § 1324 for any person to conspire or aid in the commission of any of those enumerated offenses. *Id.* (citation omitted).

"[P]ermit[ting] local law enforcement officers to arrest for these violations of federal law," while simultaneously "maintaining exclusive jurisdiction" for *"federal* prosecution in *federal* court[,]" provided further indicia of the comprehensive framework of the INA, the *GLAHR* Court reasoned. *Id.* at 1264 (citations omitted). The sweep of § 1324 includes dictating evidentiary rules for one of the enumerated offenses, as well as mandating a community outreach program regarding the penalties associated with bringing in and harboring aliens in violation of that statute. Citing to *DeCanas,* 424 U.S. 351, 96 S.Ct. 933, the Court in *GLAHR,* concluded that "[i]n the absence of a savings clause permitting the regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law." *Id.* The foregoing persuaded the Eleventh Circuit in *GLAHR* that "[t]he INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens." *Id.* at 1263.

To bolster this conclusion, the *GLAHR* Court examined section 1324's place in the "larger context of federal statutes criminalizing the acts undertaken by aliens[.]" *Id.* at 1264. After so doing, the Court found that "the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States," and that "the breadth of th[o]se laws illustrates an overwhelmingly dominant federal interest in

the field." *Id.; accord Lozano v. City of Hazleton,* 724 F.3d 297, 316 (3rd Cir.2013) (internal quotation marks and citation omitted) ("We agree with the Eleventh Circuit and other courts that have held that the federal government has clearly expressed more than a peripheral concern with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.")

Furthermore, like the "federal registration scheme" in *Arizona,* the Eleventh Circuit held that "Congress has provided a 'full set of standards' to govern the unlawful transport and movement of aliens." *Id.* (quoting *Arizona,* 132 S.Ct. at 2502). Continuing, and again relying upon *Arizona,* the *GLAHR* Court found that "[t]he INA comprehensively addresses criminal penalties for these actions undertaken within the borders of the United States, and a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue." *Id.* (citing *Arizona,* 132 S.Ct. at 2502–03). The *GLAHR* Court's final justification for finding that the Georgia statute was field preempted was that Congress did "not sanction[ ] concurrent state legislation 'on the subject covered by the challenged state law.'" *Id.* at 1265 (quoting *DeCanas,* 424 U.S. at 363, 96 S.Ct. 933).

Adopting wholesale *GLAHR*'s reasoning, the Eleventh Circuit in *Alabama,* likewise held that "Alabama is prohibited from enacting concurrent state legislation in this field of federal concern[,]" *Alabama,* 691 F.3d at 1287, *i.e.,* "the transportation, concealment, and inducement of unlawfully present aliens[.]" *Id.* at 1285 (internal quotation marks omitted); *see also U.S. v. South Carolina,* 720 F.3d 518, 531 (4th Cir.2013) (quoting *Arizona,* 132 S.Ct. at 2501) ("find[ing] the Eleventh Circuit's reasoning persuasive[,]" and holding that state statutes making it a felony to transport, move, conceal, harbor, etc. unlawful aliens were "field preempted because the vast array of federal laws and regulations on this subject . . ., is 'so pervasive . . . that Congress left no room for the States to supplement it[ ]'"). Particularly

significant here is that much like the Policy, Alabama also specifically criminalized "conspiring to transport an unlawfully present alien, *including an alien's conspiracy to be transported* [.]" *Alabama,* 691 F.3d at 1285 (emphasis added). South Carolina likewise made "it a state felony for[,]" among other things, "an unlawfully present person to allow himself or herself to be 'transported or moved' within the state[.]" *South Carolina,* 720 F.3d at 529. The striking similarity between the Policy and the Alabama and South Carolina statutes, which the Eleventh and Fourth Circuits respectively found were field preempted, further erodes the defendants' contention that *Arizona* and its progeny are not germane to the field preemption herein.

The defendants also attempt to distinguish the *GLAHR* line of cases because, in their view, unlike the Policy, those various state statutes "did not involve . . . criminal human smuggling . . . per se[;]" nor did they prohibit human smuggling "for profit or commercial purposes[ ]" as does A.R.S. § 13–2319(A). Defs.' Reply (Doc. 132) at 3:17–19, ¶ C. These claimed distinctions are, once again, unavailing. To be sure, none of those state statutes explicitly mention "human smuggling," or even "smuggling[,]" but each criminalizes transporting unauthorized or illegal aliens. The court is thus hard pressed to see how those statutes could be read to exclude smuggling, which necessarily has a transport or movement component. Furthermore, pursuant to the Policy, an unlawfully present alien who is being transported is subject to arrest and prosecution. That proscribed conduct fits within the INA's "comprehensive framework to penalize the *transportation,* concealment, and inducement *of unlawfully present aliens* [ ]" as defined in *GLAHR,* 691 F.3d at 1263 (emphasis added).

▪ The defendants fare no better with their argument that it was the breadth of the state statutes in *GLAHR* and its progeny which led to the conclusion that the federal government had fully occupied the field of alien transportation and movement within the United States. The defendants' have it backwards. When the issue is field preemption, the focus is on the breadth of the feder-

al statutes purporting to occupy a given field, not upon the breadth of the challenged state statute. *See GLAHR,* 691 F.3d at 1264 ("Based on the *breadth of federal regulation,*" the *Arizona* Court held that the federal government occupied the field of alien registration.) Consistent with that view, neither the Eleventh Circuit in *GLAHR* and *Alabama,* nor the Arizona District Court in *Valle del Sol,* considered the breadth of the challenged statutes as a basis for finding field preemption.

Equally unavailing is the defendants' contention that the Policy is not field preempted because it is *"completely harmonious* with the federal law[.]" Defs.' Resp. (Doc. 128) at 7:18 (emphasis added). Unlawful presence, alone, is not a federal crime, as more fully discussed next in connection with conflict preemption. By making it a state felony for unlawfully present aliens or non-smuggling migrants to transport themselves and no one else, however, the Policy is criminalizing mere unlawful presence. It thus strains credulity to insist, as do the defendants, that the Policy is "completely harmonious with federal law." *See id.* Even assuming *arguendo* that the Policy could somehow be deemed "parallel to federal standards[,]" as in *Arizona,* 132 S.Ct. at 2502, such an argument "ignore[s] the basic premise of field preemption ___ that States may not enter, *in any respect,* an area that the Federal Government has reserved for itself[,]" such as the transportation and movement within the United States of unlawfully present aliens. *See id.* (emphasis added).

Moving beyond this primarily textual analysis of § 1324 to its history reveals that Congress' purpose was one of "continuing efforts to strengthen [that] federal anti-smuggling law by broadening the scope of proscribed conduct." *See U.S. v. Sanchez–Vargas,* 878 F.2d 1163, 1169 (9th Cir. 1989). Tracing the evolution of that statute and its predecessors, the Ninth Circuit found that "[f]rom its genesis as a statute prohibiting only the bringing in of aliens, § 1324(a)(1) now presents a single comprehensive 'definition' of the federal crime of alien smuggling—one which tracks smuggling and related activities from their earli-

est manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens)." *Id.* This history reinforces the view that, through the INA, Congress has fully occupied the field of transporting, moving, concealing, harboring, etc. of unlawfully present aliens. Moreover, because this field necessarily encompasses the conduct which the Policy proscribes, *i.e.,* making it a state felony for unlawfully present aliens or non-smuggling migrants to conspire to transport themselves, it, too, is field preempted by the INA. In sum, none of the defendants' arguments persuade this court to depart from the Eleventh Circuit's reasoning and conclusion in *GLAHR,* 691 F.3d 1250, particularly in light of section 1324's history.

Having found that the Policy is field preempted by the INA's comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens, there is no need to consider the second prong of the plaintiffs' field preemption argument, that is, that the Policy impermissibly "circumvents Congress'[ ] framework for federal-local cooperation in regulating immigration." Pls.' SJM (Doc. 121) at 11:16–17 (emphasis omitted). Accordingly, the court grants summary judgment as to plaintiffs on the issue of field preemption, and denies the defendants' summary judgment motion in that regard.

Resolution of the field preemption issue in plaintiffs' favor is dispositive of their preemption claim. Nevertheless, the court will also address, as did the parties, the issue of conflict preemption. The court will do so for three reasons. First, the plaintiffs' conflict preemption argument is equally if not more compelling than its field preemption argument. Second, proceeding in this way recognizes that field and conflict preemption are not "rigidly distinct." *See Crosby,* 530 U.S. at 372 n. 2, 120 S.Ct. 2288 (internal quotation marks and citation omitted). Finally, even if Congress had not occupied the field in this case, because "state law is naturally preempted to the extent of any conflict with a federal statute[,]" the prudent course is to

consider the possibility of conflict preemption here as well. *See id.* at 372, 120 S.Ct. 2288 (footnote and citations omitted).

### 2. Conflict Preemption

■ Keeping in mind that an "[i]mplied preemption analysis does not justify a free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives[,]" the court will next consider whether the Policy conflicts with federal law. *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. ——, 131 S.Ct. 1968, 1985, 179 L.Ed.2d 1031 (2011) (internal quotation marks and citation omitted). Distilling the parties' conflict preemption arguments to their essence, there are two core issues: (1) whether the Policy actually conflicts with federal law; and (2) whether the Policy " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]' " *See Arizona*, 132 S.Ct. at 2501 (quoting *Hines*, 312 U.S. at 67, 61 S.Ct. 399). The Policy does both.

### a. Actual Conflict

Contending that the Policy is not conflict preempted, the defendants again claim that it is "harmonious" with federal law. *See* Defs.' SJM (Doc. 119) at 11:5. The defendants are overlooking a critical aspect of the Policy, however. The Policy effectively criminalizes conduct which federal law does not. More specifically, by deeming it a felony for unlawfully present aliens to conspire to transport themselves, the Policy is "criminalizing unlawful presence, a stance plainly at odds with federal law." [16] *See South Carolina*, 720 F.3d at 530. Indeed, the Ninth Circuit has "long made clear that, unlike illegal entry, mere unauthorized presence in the United States is not a crime." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir.2012) (citing, *inter alia*, *Martinez–Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir.2011)) ("Nor is there any other federal criminal statute making unlawful presence in the United States, alone, a federal crime, although an alien's willful failure to register his presence in the

United States when required to do so is a crime, and other criminal statutes may be applicable in a particular circumstance." (citation omitted)). Moreover, in *Arizona*, "[t]he Supreme Court recently affirmed that, '[a]s a general rule, it is not a crime for a removable alien to remain present in the United States.' " *Id.* (quoting *Arizona*, 132 S.Ct. at 2505). Thus, it defies logic to suggest, as the defendants do, that the Policy, which contravenes federal law by criminalizing conduct which Congress has chosen not to, is harmonious with federal law.

There is another way in which the Policy conflicts with federal law. Among other activities, Alabama criminalized "an alien's conspiracy to be transported[.]" *Alabama*, 691 F.3d at 1288 (internal quotation marks and citation omitted). That statute "appear[ed]" to the Fourth Circuit "to prohibit an unlawfully present alien from even agreeing to be a passenger in a vehicle." *Id.* The Court held that that statute could not "co-exist" with the federal smuggling statute, "as unlawfully present aliens who are transported 'are not criminally responsible for smuggling under 8 U.S.C. § 1324[.]' " *Id.* (quoting *United States v. Hernandez–Rodriguez*, 975 F.2d 622, 626 (9th Cir.1992)). Because the Policy at issue herein likewise "appears to prohibit an unlawfully present alien even from agreeing to be a passenger in a vehicle[,]" the court finds that it, too, cannot "co-exist with § 1324(a)." *See id.*

The Policy and federal law conflict in another way, as the plaintiffs point out. The federal crime of alien smuggling includes transporting or moving an illegal alien within the United States. 8 U.S.C. § 1324(a)(1)(A)(ii). That offense requires that "the smuggling be 'in furtherance of such violation of law,' " meaning that the defendants moved the alien 'in order to help him or her to remain in the United States illegally.' " *United States v. Aguilar–Reyes*, 723 F.3d 1014, 1016 (9th Cir.2013) (quoting Ninth Circuit Model Criminal Jury Instructions § 9.2 (2010)). In contrast, Arizona's

---

**16.** The court agrees with the general proposition that, standing alone, A.R.S. § 13–2319 does not "criminalize[] unlawful presence." *See Melendres v. Arpaio*, 2013 WL 2297173, at *76 (D.Ariz.

May 24, 2013). However, the Policy, which is based upon Arizona's human smuggling statute and its conspiracy statute, does criminalize unlawful presence, as fully discussed above.

smuggling statute requires that the person transporting or moving "knows or has reason to know" that the transported person is an alien, and that the smuggling be for "profit or commercial purpose." A.R.S. §§ 13–2319(F)(3) and (A). Thus, neither the § 13–2319 nor the Policy include the "in furtherance" element of the federal statute. As a result, the Policy "penalize[s] persons whom the narrower federal statute does not." Pls.' SJM (Doc. 121) at 17:7–10.

Not only does the Policy substantively conflict with federal law, but it also conflicts from an operational standpoint. Indeed, despite the defendants' insistence to the contrary, there is record proof of an actual conflict. The defendants admit that the MCSO has "arrested at least 1,800 non-smugglers for conspiring to violate § 13–2319[.] Pls.' SOF (Doc. 121–1) at 3:27–28, ¶ 3 (citation omitted); Defs.' Resp. SOF (Doc. 129) at 3:15, ¶ 3. The defendants further admit that the MCAO has "prosecuted 1,357 non-smugglers for conspiracy to violate § 13–2319." *Id.* at 4:5–6, ¶ 4 (citation omitted); Defs.' Resp. SOF (Doc. 129) at 3:16, ¶ 4. The foregoing belies the defendants' blanket assertion that plaintiffs have not offered any evidence of an actual conflict between the Policy and federal immigration law. *See* Defs.' SJM (Doc. 119) at 10:23–25 ("[T]here is no evidence from the Policy's nearly seven years of history that there has been any conflict between federal immigration law, ..., and the Policy.") What is more, because the Policy "criminalizes actions that Congress has, as a policy choice, decided are a civil matter[,]" it is hard to imagine a more blatant conflict than that. *See South Carolina,* 720 F.3d at 530. Given these various conflicts, the court gives no credence to the defendants' argument that there is no "clear proof of conflicts between federal law" and the Policy. *See* Defs.' SJM (Doc. 119) at 10:26–27.

### b. Obstacle Preemption

■ Turning to obstacle preemption, the Supreme Court has instructed that "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby,* 530 U.S. at 373, 120 S.Ct. 2288. It matters not "whether that obstacle goes by the name of conflicting; contrary to; ... repugnance; difference; irreconcilability; inconsistency; violation; curtailment; ... interference, or the like." *Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (internal quotation marks and citations omitted).

Viewed from this perspective, the court likewise is persuaded that the Policy "presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration." *See GLAHR,* 691 F.3d at 1265 (footnote omitted). "[M]ere unauthorized presence is not a criminal matter." *Melendres,* 695 F.3d at 1002. By the same token though, unauthorized presence is a civil violation that can lead to deportation under federal law. *See South Carolina,* 720 F.3d at 530 (citing 8 U.S.C. § 1227) ("Under federal law, unlawfully present aliens are subject to civil removal proceedings."); *see also Gonzales v. City of Peoria,* 722 F.2d 468, 476–477 (9th Cir.1983) (explaining that illegal presence is "only a civil violation"), *overruled on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999).

Recognizing that important distinction, the Fourth Circuit held that the district court correctly enjoined a South Carolina statute making it "a state felony for an unlawfully present person to allow himself or herself to be 'transported or moved' within the state or to be harbored or sheltered to avoid detection." *Id.* at 522 (footnote omitted). Borrowing heavily from *Arizona,* the Court explained:

'A principal feature of the removal system is the broad discretion exercised by immigration officials.' *Arizona,* 132 S.Ct. at 2499. This discretion is necessary because it 'involves policy choices that bear on this Nation's international relations.' *Id.* The State, by criminalizing what Congress has deemed a civil offense and entrusted to the discretion of the executive branch, is 'pursu[ing] policies that undermine federal law.' *Id.* at 2510.

*Id.* at 530. Based upon that rationale, the Fourth Circuit held that certain sections of

South Carolina's immigration law were "conflict preempted because they stand as an obstacle to the execution of the federal removal system and interfere with the discretion entrusted to federal immigration officials." *Id.* Simply put, the Fourth Circuit held that federal immigration law preempted certain state statutes "because they criminalize actions that Congress has, as a policy choice, decided are a civil matter." *Id.* The *South Carolina* Court's reasoning applies with equal force here, where the Policy also criminalizes conduct, an alien's unlawful presence, that Congress has determined is a civil violation.

Put differently, the Policy "creates a new crime unparalleled in the federal scheme." *See GLAHR*, 691 F.3d at 1266. And, by making it a felony for unlawfully present aliens, or non-smuggling migrants, to conspire to transport themselves, much like the statutes at issue in *GLAHR* and *Alabama*, the Policy is "an impermissible 'complement' to the INA that is inconsistent with Congress'[ ] objective of creating a comprehensive scheme governing the movement of aliens within the United States." *See GLAHR*, 691 F.3d at 1266 (quoting *Hines*, 312 U.S. at 66–67, 61 S.Ct. at 404).

Moreover, as in *Alabama*, the Policy "undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration." *See Alabama*, 691 F.3d at 1287. Congress granted local law enforcement officials limited authority under the federal smuggling statute. They may arrest for such crimes, but not prosecute because section 1324 crimes are subject to prosecution in federal court. *See* 8 U.S.C. § 1329. Thus "[b]y confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney." *See GLAHR*, 691 F.3d at 1265 (citations omitted). The Policy, which makes

criminal, what Congress has deemed to be a civil violation, is "not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish." *See id.* (citation omitted).[17]

In a similar vein, local arrest, detainment and prosecution of unlawfully present aliens, or non-smuggling migrants, for conspiring to transport themselves under the Policy "unconstrained by federal law threaten[s] the uniform application of the INA." *See GLAHR*, 691 F.3d at 1266. That is because, as the Eleventh Circuit soundly reasoned:

> Each time a state enacts its own parallel to the INA, the federal government loses 'control over enforcement' of the INA, thereby 'further detract[ing] from the integrated scheme of regulation created by Congress.'

*Id.* (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 288–89, 106 S.Ct. 1057, 1062, 89 L.Ed.2d 223 (1986) (quotation marks omitted)) (other citations omitted). "Given the federal primacy in the field of enforcing prohibitions on the transportation" and movement, among other activities, of "unlawfully present aliens," the court concurs with the Eleventh Circuit that "the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern." *Id.* These various conflicts between the Policy and federal law strengthen the court's earlier finding of field preemption. *See Arizona*, 132 S.Ct. at 2503 (finding that "specific conflicts ... underscore[d] the reason for field preemption[ ]").

Given that the Policy actually conflicts with federal immigration law, and that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[,]" *Arizona*, 132 S.Ct. at 2501

---

17. Maintaining that the Policy does not create an obstacle to compliance with federal law, the defendants assert that "states may prosecute an act which constitutes *both* a federal and state offense under the state's police power without impinging on federal jurisdiction." Defs.' SJM (Doc. 119) at 11:10–11 (citation omitted) (emphasis added). Of course, in making this assertion, defendants wholly disregard that the "state offense" which

the Policy proscribes is not a federal offense. Thus, the defendants cannot avoid a finding of conflict preemption by invoking the state's police power. *See Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604, 35 S.Ct. 715, 717, 59 L.Ed. 1137 (1915) ("The legislation is not saved by calling it an exercise of the police power[.]")

(internal quotation marks and citation omitted), the plaintiffs have met the "high threshold" necessary to support a finding of conflict preemption. *See Whiting,* 131 S.Ct. at 1985 (internal quotation marks and citation omitted). To conclude on the issue of conflict preemption, the court grants summary judgment in favor of the plaintiffs, and denies the defendants' summary judgment in this regard.

### C. Dismissal of Remaining Claims

The plaintiffs are "reced[ing]" or backing away from "their remaining claims[,]" that is, their claims for unlawful search and seizure, denial of due process and a pendent state claim for violations of A.R.S. §§ 13–2319 and 13–1003. Pls.' Resp. (Doc. 126) at 16:27–28, n. 5. The plaintiffs expressly seek voluntary dismissal of these claims pursuant to Fed.R.Civ.P. 41(a)(2). However, they do not specify whether they are seeking dismissal with or without prejudice, "implicitly accepting either determination by th[is] district court." *See Hargis v. Foster,* 312 F.3d 404, 412 (9th Cir.2002).

If an order granting voluntary dismissal in accordance with Rule 41(2) is silent, that Rule presumes dismissal without prejudice. Fed.R.Civ.P. 41(2) ("Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.") That said, " '[t]he 'broad grant of discretion' that Federal Rule of Civil Procedure 41(a)(2) vests in the district court to dismiss 'on terms that the court considers proper' 'does not contain a preference for one kind of dismissal or another.' " *Real Estate Disposition Corp. v. National Home Auction Corp.,* 2009 WL 764529, at *1 (C.D.Cal.2009) (quoting *Hargis,* 312 F.3d at 412; and Fed.R.Civ.P. 41(a)(2)). "As such, th[is] district court has discretion as to whether to grant a voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) with or without prejudice." *See id.* (citing *Hargis,* 312 F.3d at 412).

The defendants do not object to the dismissal of the three claims just identified, but from their standpoint that dismissal should be *"with* prejudice." Defs.' Reply (Doc. 132) at 1:27 (emphasis in original). As justification, the defendants point out that the "[p]laintiffs have had sufficient time to develop an evidentiary record to present genuine issues of material fact precluding summary judgment and to substantively respond to" defendants' summary judgment motion on the three non-preemption claims. *Id.* at 1:27–2:1.

The defendants' position is well-taken. In addition, the defendants should not have the cloud of future litigation over the other claims when, apparently, the plaintiffs made a deliberate choice to pursue only the preemption claim. Moreover, the plaintiffs have not provided any reason for granting their request without prejudice. Under these circumstances, the court, in the exercise of its discretion, dismisses with prejudice the FAC's second, third and fourth claims.

### II. Class Certification

The plaintiffs are seeking to certify two classes. The first they define as "[a]ll individuals who *are—*. . stopped, detained, arrested, incarcerated, prosecuted, or penalized for conspiring to transport themselves, and themselves only, in violation of Ariz.Rev.Stat. § 13–2319[ ] ["the individual class"][.]" Class Certification Motion (Doc. 122) at 5:26–28 (emphasis added). Alternatively, the plaintiffs are seeking to certify a class of "[a]ll individuals who ... pay taxes to Maricopa County and object to the use of county tax revenues to stop, detain, arrest, incarcerate, prosecute, or penalize individuals for conspiring to transport themselves, and themselves only, in violation of Ariz.Rev.Stat. § 13–2319 ["the taxpayer class"]." *Id.* at 5:26 and 6:2–3. The defendants oppose certification of both.

Rule 23 "give[s] the district court broad discretion over certification of class actions[.]" *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1019 (9th Cir.2011). However, class certification remains " 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " *Comcast Corp. v. Behrend,* 569 U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). "[T]o justify a de-

parture from that rule, a class representative *must be part of the class* and possess the same interest and suffer the same injury as the class members." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (internal quotation marks and citations omitted) (emphasis added).

▮▮▮ Before delving into the parties' contentions as to each of the Rule 23 factors, there is a preliminary, dispositive issue with respect to the first proposed class. Essentially, the defendants contend that because none of the named plaintiffs have been stopped, detained, arrested, prosecuted, etc. in accordance with the Policy, they are not members of the proposed first class, and so cannot serve as class representatives thereof. The court agrees. *See Juvera v. Salcido,* 294 F.R.D. 516, 520, 2013 WL 1367354, at *3 (D.Ariz. April 4, 2013) (citing *Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)) ("[T]he named representative must be a member of the class.")

Although the defendants did not mention it, there is another compelling reason for not certifying the first proposed class. That is because, regardless of the class definition, the requested relief here is identical. Basically, both classes are seeking: (1) a declaration that federal law preempts the Policy; and (2) an injunction permanently enjoining the defendants from taking any further action under the Policy. In light of the foregoing, if the court finds that class certification is proper as to the proposed alternative class—the taxpayers—the plaintiffs will recover complete relief, obviating the need for certification of the first proposed class. The court will, thus, proceed to the issue of whether the plaintiffs have met their burden of " 'affirmatively demonstrat[ing] . . . compliance' with Rule 23." *See Comcast,* 133 S.Ct. at 1432 (quoting *Wal–Mart,* 131 S.Ct. at 2551–2552).

"A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 542, 2013 WL 4712728, at *2 (Sept. 3, 2013). In the present case, the plaintiffs are seeking class certification pursuant to Rule 23(b)(2) premised on the defendants having "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate requesting the class as a whole[.]" Fed.R.Civ.P. 23(b)(2).

### A. Rule 23(a)

" 'Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.' " *Wang,* 737 F.3d at 542 (quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011)). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R.Civ.P. 23(a). Succinctly put, that Rule "requires a party seeking class certification to satisfy four requirements: numerosity, commonality, typicality, and adequacy of representation." *Wang,* 737 F.3d at 542 (citation omitted).

The defendants readily agree, and the court so finds, that the first two Rule 23(a) elements—numerosity and commonality—are satisfied in this case. See Defs.' Resp. (Doc. 127) 2:24–25 ("Based on research and review of Plaintiffs' Motion, Defendants agree that this case satisfied the numerosity and impracticability element required for a class action."); and at 3:8–10 ("Based on the foregoing authority and review of Plaintiffs' Motion, Defendants agree that this case raises issues of both law and fact that are common to the members of the proposed class.") The parties are at odds, however, as to whether

the plaintiffs can satisfy Rule 23(a)'s typicality and adequacy requirements.

### a. Typicality

■ The plaintiffs assert that because they have satisfied the commonality requirement, they have also satisfied the typicality requirement. The defendants counter by repeating their argument that the named taxpayer plaintiffs lack standing. The defendants thus imply that that purported lack of standing means that the claims of these plaintiffs are not typical of the taxpayer class. This is the only reason the defendants offer as to why the plaintiffs have not shown typicality as to the proposed taxpayer class. Of course, the court has already found that the taxpayer plaintiffs Haglund and Lujan do have standing—a finding which undermines this defense argument. What is more, "[i]n a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Haro*, 729 F.3d at 1001 (internal quotation marks and citation omitted). Here, as this court has found, two of the named plaintiffs have standing. Thus, the defendants' lack of standing argument simply has no place in deciding whether to grant class certification.

■ Typicality, like commonality, "serve[s] as [a] guidepost[ ] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal–Mart*, 131 S.Ct. at 2551, n. 5 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (2011) (internal citation and quotation marks omitted).

That test is easily met in the present case. Plaintiffs Haglund and Lujan and the putative taxpayer class members claim the same injury and object to the same conduct. The

taxpayer plaintiffs, and the class which they are seeking to represent, allege misuse of their Maricopa County taxes to fund all aspects of the Policy. Further, this action is based on conduct which is not unique to the named taxpayer plaintiffs, *i.e.*, enforcement of the Policy, which federal law preempts. And, obviously other taxpayer class members have been injured by the use of their Maricopa County taxes to fund the Policy. The court thus finds that plaintiffs have met the "permissive standards" of typicality. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.1998).

### b. Adequacy

■ Rule 23(a)(4) "satisf[ies] due process concerns [ ]" in that "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). This requirement thus "raises concerns about the competency of class counsel and conflicts of interest." *Wal–Mart*, 131 S.Ct. at 2551 n. 5 (citation and internal quotation marks omitted). Therefore, "[a]dequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985 (citation omitted). Consequently, "[t]o determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?' " *Id.* (quoting *Hanlon*, 150 F.3d at 1020).

In addition to the foregoing, Rule 23(g) articulates four criteria that a court must consider in evaluating the adequacy of proposed class counsel. Those mandatory criteria are:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class[.]

Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv) (emphasis added). In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed.R.Civ. P.23(g)(1)(B). "No single factor should necessarily be determinative in a given case." Fed.R.Civ.P. 23(g) Advisory Committee note.

■ Here, the parties' adequacy of representation arguments are lacking, but for different reasons. The defendants did not address the critical issue of potential conflicts and vigorous prosecution. Instead, in reliance upon their typicality argument, the defendants simply declare that "the named Plaintiffs cannot fairly and adequately protect the interests of either one of the two alternative proposed classes." Defs.' Resp. (Doc. 127) at 5:4–5.

To be sure, the typicality requirement does "tend to merge with the adequacy-of-representation requirement[.]" *Wal–Mart*, 131 S.Ct. at 2551 n. 5 (citation and internal quotation marks omitted). In the present case, however, because the defendants' typicality argument attacked only the taxpayer plaintiffs' standing, it has no bearing on the adequacy of representation. Given this context, the defendants' reliance upon their typicality argument is misplaced. Furthermore, the plaintiffs' discussion of the conflict of interest and vigorous prosecution issues is perfunctory, to say the least, as is their discussion of the Rule 23(g).

Despite these shortcomings, the court concludes that the plaintiffs have satisfied the adequacy of representation requirement. Not only have the defendants failed to point to any claimed conflicts of interest, but the court can perceive of none. As should be abundantly clear by now, the interests of the named plaintiffs and their counsel are nearly identical in every way to those of the putative taxpayer class members. Furthermore, during the nearly seven year course of this litigation, the vigorous prosecution of this lawsuit by plaintiffs' counsel is evident from, among other things, the extensive discovery, motion practice, and an appeal to the Ninth Circuit. The decision by plaintiffs' counsel to pursue only one of the four claims in the FAC demonstrates that they have seriously engaged in identifying and investigating potential claims as well. *See* Fed.R.Civ.P. 23(g)(1)(A)(i).

The other three Rule 23(g) factors weigh heavily in favor of appointing Peter A. Schey and Carlos Holguín of the Center for Human Rights and Constitutional Law Foundation ("the Foundation") as lead counsel for the plaintiffs. This nonprofit, public interest foundation routinely litigates on behalf of immigrants and refugees raising constitutional and civil rights issues. Attorney Schey is the President and Executive of the Foundation, and has been from 1980 to the present. Http:/centerforhumanrights.org/staff (last visited Sept. 15, 2013); *see also* Schey Decl'n (Doc. 21–1) at 8, ¶ 1. Attorney Holguín has served as General Counsel with the Foundation since 1984. *Id.* The depth of their collective experience in handling class actions and immigration issues can be discerned from a representative sampling of lawsuits where they have successfully litigated in this area. *See, e.g., Immigration Assistance Project of the Los Angeles Fed'n of Labor v. I.N.S.*, 306 F.3d 842 (9th Cir.2002) (summary judgment granted in favor of an immigrant class challenging provisions of the Immigration Reform and Control Act of 1986, where attorney Schey served as co-lead counsel); *Catholic Social Services, Inc. v. I.N.S.*, 232 F.3d 1139 (9th Cir.2000) (affirming grant of preliminary injunction to alien class qualified to challenge advance parole policy); and *Perez–Olano v. Gonzalez*, 248 F.R.D. 248 (C.D.Cal.2008) (certifying a nation-wide class and granting permanent injunctive and declaratory relief where defendants' application of a specific consent requirement deprived immigrant migrants in federal custody of the special immigration juvenile provisions of the INA).

Through their extensive experience litigating immigration issues, attorneys Schey and Holguín certainly are knowledgeable in the

applicable law. Finally, there is no reason to doubt that they, and the Foundation in particular, have the necessary resources to devote to representing the plaintiff class. Therefore, the court finds that Peter Schey and Carlos Holguín satisfy the Rule 23(g) criteria and can adequately represent the plaintiff class certified herein.

### B. Rule 23(b)(2)

■■■ Here, where the plaintiffs are seeking an injunction and declaratory relief which would "provide relief to each member of the class[,]" and no compensatory damages, they are properly invoking Rule 23(b)(2).[18] *See Wal–Mart*, 131 S.Ct. at 2557. As the *Wal–Mart* Court instructed, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (internal quotation marks and citation omitted). The equitable relief which the plaintiffs herein are seeking fits that description. Thus, because the plaintiffs have met their burden of satisfying each of the Rule 23(a) requirements, and that of Rule 23(b)(2), the court grants their motion for class certification as to the taxpayer plaintiffs.

### Conclusion

In light of the foregoing, the court hereby **ORDERS** that:

(1) Defendants' Motion for Summary Judgment (Doc. 119) is **DENIED**;

(2) Plaintiffs' Motion for Summary Judgment (Doc. 121) is **GRANTED** as to their first claim ("Federal Preemption");

(3) Plaintiffs' second claim for relief ("Unlawful Search and Seizure; violation of 42 U.S.C. § 1983"), third claim for relief ("Denial of Due Process; violation of 42 U.S.C. § 1983"); and fourth claim for relief ("Pendent State Claim: Violation of Ariz.Rev.Stat. §§ 13–2319 and 13–1003") are **DISMISSED**

**WITH PREJUDICE** pursuant to Fed. R.Civ.P. 41(a)(2);

(4) Plaintiffs' Motion for Class Certification pursuant to Fed.R.Civ. 23(b)(2) (Doc. 122) is **GRANTED** in part and **DENIED** in part. The court certifies a class defined as: "All individuals who pay taxes to Maricopa County and object to the use of county tax revenues to stop, detain, arrest, incarcerate, prosecute, or penalize individuals for conspiring to transport themselves, and themselves only, in violation of Ariz.Rev.Stat. § 13–2319."

**IT IS FURTHER ORDERED** that:

(5) Carlos Holguín and Peter A. Schey of the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA 90057; telephone: (213) 388–8693; facsimile: (213) 386–9484; e-mail: crholguin@centerforhumanrights.org, and pschey@centerforhumanrights.org, are appointed as lead class counsel for the class certified herein;

(6) Plaintiffs are entitled to a declaration that federal law preempts and renders invalid the Maricopa County Migrant Policy;

(7) Defendants Maricopa County Sheriff Joseph M. Arpaio and Maricopa County Attorney William G. Montgomery, and their agents, employees, successors in office, and all other persons who are in active concert or participation with the Maricopa County Sheriff's Office and the Maricopa County Attorney's Office, are permanently enjoined from further implementing the Maricopa Migrant Conspiracy Policy including detaining, arresting, and prosecuting persons for conspiring to transport themselves, and no one else, in violation of Ariz.Rev.Stat. § 13–2319;

(8) Defendants shall promptly serve Class Counsel with copies of any instructions or guidelines they issue to implement this Order;

(9) Prior to bringing any motion or application to clarify, modify or enforce this injunction, the parties, through counsel, shall meet and confer in good faith to resolve their differences; and

---

**18.** Because their response does not even mention this aspect of plaintiffs' class certification motion, the court assumes that the defendants concede that the plaintiffs are properly relying upon Rule 23(b)(2).

(10) The court shall retain continuing jurisdiction to enforce the terms of this Order and Permanent Injunction.